IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 28, 2015

**STATE OF TENNESSEE v. RANDY WAYNE JOHNSON**

**Appeal from the Criminal Court for Carter County
Nos. 22386, 22378    Robert E. Cupp, Judge**

_____

**No. E2014-01613-CCA-R3-CD – Filed June 12, 2015**

_____

Defendant, Randy Wayne Johnson, challenges the sufficiency of the evidence supporting his conviction for especially aggravated kidnapping. He argues that the kidnapping was merely incidental to the accompanying assault, of which he was also convicted. Because Defendant's conduct in committing the kidnapping constituted a separate and independent offense, there is sufficient evidence to support his conviction, and Defendant is not entitled to relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

David F. Bautista, District Public Defender, and David Crichton, Assistant Public Defender, Elizabethton, Tennessee, for the appellant, Randy Wayne Johnson.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Tony Clark, District Attorney General; and Dennis D. Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

This is Defendant's direct appeal from his multiple convictions, resulting in a sentence of twenty-five years at 100 percent, from the Criminal Court of Carter County.

On November 8, 2013, the Carter County Grand Jury returned a two-count indictment in case number 22386 against Defendant for felony evading arrest, a Class E felony, and aggravated assault, a Class C felony. On the same day, the grand jury also returned an indictment in case number 22378 against Defendant for: 1) especially aggravated kidnapping, 2) aggravated assault, 3) driving under the influence ("DUI"), 4) evading arrest by motor vehicle, 5) driving on a suspended license ("DOSL"), and 6) simple possession of a Schedule II controlled substance. On June 24, 2014, the trial court held a bench trial.

Brooke Thornburg, the victim in case number 22378, testified that she was thirty-two years old and had three minor children. On March 19, 2013, Ms. Thornburg lived in the Lynwood Apartments in Elizabethton. At that time, she had been romantically involved with Defendant for around six or eight months. Although they did not live together, Defendant stayed with Ms. Thornburg "most of the time."

On the night of the incident, the couple "grabbed some food," and Defendant "had a little bit of Crown Royal liquor." Later, they were "hanging out at home" when one of Defendant's friends called and asked for a ride to Jonesborough. Defendant asked Ms. Thornburg to accompany him, and they went to Talladega Apartments in Elizabethton to pick up a man named Kevin, whom Ms. Thornburg had never met.[1]

They all rode in a "single cab truck" with a "blue, long bed." Defendant drove, and Ms. Thornburg sat between the two men. Nothing unusual happened on the way to Jonesborough. Defendant "was happy," and "everything was good." Defendant was drinking the Crown Royal, and he stopped in Johnson City so that Ms. Thornburg could purchase a "thirty-two-ounce beer."

When the group arrived in Jonesborough, Kevin left the vehicle and went inside a residence. The couple remained "in the truck talking" while they waited for Kevin to return. Defendant dropped his cigarette behind the seat and "yelled" at Ms. Thornburg to pick it up. She refused, and Defendant hit her "in the side of [her] face" with his fist, which fractured her nose. Ms. Thornburg's nose immediately began "spraying blood." She retrieved the cigarette and handed it to Defendant, who then began hitting her again. Defendant "screamed" at Ms. Thornburg to stop her nose from bleeding. When she responded that she did not know how to make the bleeding stop, Defendant removed his shirt and threw it at her. Ms. Thornburg held the shirt to her face. At this point, Kevin

---

[1] During cross-examination, Defendant testified that Kevin's last name was Stover and that they met at a party. Defendant had known Kevin "for a while," and Kevin worked for Defendant "for a little while." Defendant could not locate Kevin to testify at trial.

returned to the vehicle and appeared "dumbfounded." He entered the vehicle but did not say or do anything to get involved in the couple's altercation.

Defendant began driving back to Elizabethton but continued "screaming" at and hitting Ms. Thornburg. She leaned into Kevin to avoid Defendant, and Kevin told Defendant to "calm down" because Ms. Thornburg was "scared." Ms. Thornburg "had bruises all over [her] ribs and down [her] face" from the Defendant's blows.

Eventually, Ms. Thornburg surreptitiously retrieved her cell phone from her purse, dialed 911, and returned the phone to her purse. She instructed Defendant to let her out of the vehicle and continued to describe their location so that the 911 dispatcher listening to the altercation through the phone would know where to send the police. She told Defendant that she would not report the incident if he would let her leave.[2]

Ms. Thornburg remembered Defendant threatening her several times by saying, "I'm going to slit your throat. I'm going to cut your throat and throw you out here, bitch." The return ride from Jonesborough lasted between twenty and twenty-five minutes, and the beating "was pretty steady" the entire time.

When the threesome returned to Talladega Apartments, Kevin got out of the truck. Ms. Thornburg did not see anyone outside the apartments because it was "pretty late in the evening." Ms. Thornburg said to Kevin, "Please don't leave me." Kevin replied, "You'll be fine." Ms. Thornburg described the following when she attempted to get out of the truck:

> [Defendant] grabbed my hair and got me down in the truck and was beating me in my face, and I was trying to hide my face. And then he pulled out the knife and he had my hair and held it to my throat and he told me that he was going to take me to the lake and cut my throat and throw me out.

Ms. Thornburg could not describe the knife because she "didn't really see it," but she felt it pressed against her neck. Defendant held the knife to her throat for "maybe a minute or two" before he put it away and began driving again. Ms. Thornburg did not know where Defendant put the knife, but "it was definitely still in the truck." Later during the trial, Ms. Thornburg identified a knife that she believed to be the one used to assault her, but it looked different than she remembered.

Defendant stopped hitting Ms. Thornburg and drove "back through town," where they encountered the police about ten minutes later. Defendant began driving "erratically," and Ms. Thornburg "hunkered down in the seat" and "hop[ed] to God" the

---

[2] An audio clip of the 911 recording was published for the trial judge.

police would stop the truck. As Defendant fled, Ms. Thornburg kept the "open line" with 911 and continued begging Defendant to let her out of the truck. Defendant "was still saying he was going to get away and wreck the truck or try to just get away." Ms. Thornburg considered "diving out of the truck" but it was going too fast for her to escape safely. When Defendant finally stopped the truck, he told Ms. Thornburg, "I'm sorry. I love you."

On cross-examination, Ms. Thornburg insisted that she "did not want to be there" once Defendant began hitting her and that she believed Defendant was going to "murder" her. Ms. Thornburg explained that she could not get out of the vehicle on the return ride from Jonesborough to Elizabethton because the passenger window was up and Kevin "was quite a big guy."

On the night of March 19, 2013, Jordan Ensor, a police officer with the Elizabethton Police Department, was dispatched to a location behind Talladega Apartments based on a reported domestic assault occurring inside of a blue truck. Officer Ensor was instructed to look for the blue truck traveling eastbound on G Street. He spotted the truck, which contained a male driver and a female passenger. The situation "seemed normal" inside the truck. The truck's license plate number matched the one reported to 911.

When the vehicles arrived at the stop sign at the intersection of Cedar Avenue and Maple Street, Officer Ensor activated his blue lights. The truck sped off, turned down Johnson Avenue, and continued driving away. Officer Ensor activated his sirens and began chasing the truck. The female passenger was "motioning" with her hand for Officer Ensor to continue his pursuit.

After the truck turned onto Johnson Avenue, it then turned right onto Stateline Road. Because there was no oncoming traffic, Officer Ensor moved his vehicle into the opposite lane and positioned the front of his vehicle near the truck's rear bumper. He then illuminated the spotlight attached to his vehicle to identify the driver. The driver looked over his left shoulder at Officer Ensor, applied the truck's brakes, and "swerved" toward Officer Ensor's vehicle, entering the lane by "maybe a foot or two." Officer Ensor was forced "to have to slam on [his] brakes and swerve to avoid collision." Officer Ensor's vehicle slowed down but it stayed on the road and did not spin out of control. There was no contact between the two vehicles. This was the only occasion that the truck swerved toward Officer Ensor, but it "scared" him.

The truck returned to its lane of travel and slowed to a speed below twenty miles per hour. The truck then suddenly accelerated to a speed exceeding 100 miles per hour. Officer Ensor slowed his vehicle because it was unsafe to continue traveling at such a high rate of speed on Stateline Road at night. He lost sight of the truck until he reached

Highway 19E, where he observed a vehicle driven by Sergeant Isaac Rhea of the Carter County Sheriff's Department "begin to overtake" the truck. Officer Ensor and Sergeant Rhea continued chasing the truck on "some county roads" and were joined by another vehicle driven by Sergeant Nick Andes of the Carter County Sheriff's Department.

When Sergeant Rhea began losing sight of the truck, Sergeant Andes notified Sergeant Rhea that he would take the lead because his patrol car was "better equipped to keep up." Sergeant Andes saw a female passenger with "red all over her face" who was "turned all the way around . . . beating on the back of the window and begging for help." Sergeant Andes "could kind of read her lips because she was screaming, 'Help! Help! Help!' pretty frantic[ally]."

Based on the reported location of the truck, Lieutenant Kenny Cornett of the Carter County Sheriff's Department positioned his patrol car in the median of Highway 19E. Lieutenant Cornett activated his "overhead lights," exited his vehicle, and waited for the truck to arrive. When Lieutenant Cornett observed the truck approaching, he deployed "scorpion spike strips" across the road. The truck hit the spike strips, but they did not puncture the tires.

At one point, the truck "almost had a head-on collision with a vehicle at the intersection of River Bottom and Riverview." On Long Hollow Road, as the truck's speed exceeded seventy miles per hour, the female passenger tried to open the passenger door, but the driver jerked her back inside. She continued to motion for Sergeant Andes to keep following the truck. Liquid began leaking from the bottom of the truck, and it appeared to Sergeant Andes that "something was wrong with the truck."

The chase lasted for approximately ten to fifteen minutes before the truck stopped in a construction zone on Gap Creek Road. The driver exited the truck, put his hands up, and Sergeant Andes arrested him. The female passenger remained in the truck. As Sergeant Andes took the driver to the back of his patrol car, the driver "said something to the effect, 'I'm sorry, man. I'm just drunk. I'm just drunk.'" Sergeant Andes noticed red "strike marks" on the palm of the driver's right hand that could have been made "with a backhand type motion . . . with . . . fists closed." There were scratches on the top of his right hand and some blue discoloration "as if bruising was beginning on the knuckles."

The female passenger was "bleeding profusely from her face [and] her nose. She was spitting up, coughing up blood." There was blood and some bruising on her face. She "appeared to be terrified" and "very hysterical." "She was very distraught, very upset, crying, [and her] voice was shaking to the point that . . . it was hard for [the officers] to understand what she was saying." She did not appear to be under the influence of either drugs or alcohol, but the officers could not determine whether she had been drinking.

There was "a thin long mark" on the female passenger's neck, and she told Sergeant Rhea that the driver "had a knife to her throat." The mark on her neck "was a red enough mark like it was on the verge of bleeding," and "it was consistent with [someone] holding something very hard against the skin." The female passenger said that the driver "had told her that he was going to take her somewhere to kill her [be]cause he'd come home and found her with another guy inside their apartment."

An ambulance took Ms. Thornburg to the hospital, where a MRI scan revealed a fracture in her nose. She did not need surgery for the fracture, but she had to breathe through her mouth for three to four weeks. "It took about a good solid four days" for the nose bleeding to cease. Her nose was swollen badly and caused sleeping complications because it impaired her breathing. The fracture "kicked up [Ms. Thornburg's] sinuses real bad," and she testified that she suffered "bad sinus pressure headaches" once or twice per week. She did not have severe headaches like these before this incident. She also "ke[pt] a stuffy nose," which produced bloody mucus if she blows it.

The inside of the truck was covered with blood and smelled of alcohol. "[B]lood was dripping down off the floorboard onto the road." Sergeant Andes found an oxycodone pill and a closed folding knife on the floorboard of the driver's side of the truck. No blood was on the knife. There was also a bloody shirt on the floorboard of the passenger's side of the truck. In the middle passenger seat, there was a thirty-two-ounce Natural Ice beer can.

Defendant testified that he and Ms. Thornburg were both drinking on the night of the incident and that Kevin gave Defendant the oxycodone pill in exchange for the ride to Jonesborough. As they drove to Jonesborough, Ms. Thornburg was "hanging all over Kevin, flirting and stuff," which "caused the fight." Defendant claimed that the physical fighting began because Ms. Thornburg "smacked the cigarette out of [his] mouth."

Defendant admitted that he hit Ms. Thornburg in the face, causing her nose to bleed incessantly. He also admitted that he "hit her a couple of times" on the way back to Talladega Apartments because they were still arguing. However, Defendant denied keeping Ms. Thornburg inside the truck against her will and insisted that she "never tried to get out." He also denied hitting her or pulling her hair at Talladega Apartments after they dropped off Kevin.

Defendant acknowledged that the knife found in the truck belonged to him and admitted that it was in his possession during the incident. However, he denied displaying the knife or threatening Ms. Thornburg with it. He also denied threatening to cut her throat.

Defendant testified that he refused to stop the truck when Officer Ensor initiated the traffic stop because he knew that he would have a parole violation and would go to jail. Defendant said that Ms. Thornburg told the police that she had not been kidnapped by Defendant.

Defendant pled guilty in case number 22378 to DUI second offense, DOSL third offense, felony evading arrest, and simple possession. The State dismissed the felony evading arrest charge in case number 22386 because it was duplicative of the charge in the other case. The trial court took the case under advisement and set the sentencing hearing for July 24, 2014, where it announced its findings of fact and the verdict as to the remaining charges.

In case number 22378, the trial court found Defendant guilty of especially aggravated kidnapping, a Class A felony. The trial court also found Defendant guilty of simple assault, a Class A misdemeanor, as a lesser-included offense of aggravated assault, for hitting Ms. Thornburg and fracturing her nose. Defendant received a twenty-five-year sentence for especially aggravated kidnapping as a violent offender and a two-year sentence for felony evading arrest as a multiple offender. The trial court sentenced Defendant to eleven months and twenty-nine days in the county jail for each conviction of assault, DUI, DOSL, and simple possession.

In case number 22386, the trial court found Defendant guilty of simple assault, a Class A misdemeanor, as a lesser-included offense of aggravated assault, for swerving his truck toward Officer Ensor's vehicle during the chase. For this offense, the trial court sentenced Defendant to eleven months and twenty-nine days in the county jail. All sentences in both cases are to be served concurrently one with another and consecutive to "any unexpired sentence."[3]

Defendant filed a timely notice of appeal.

*Analysis*

Defendant's only issue on appeal is that there is insufficient evidence to support his conviction of especially aggravated kidnapping. He does not challenge his other convictions or his sentences. Specifically, Defendant relies on *State v. White*, 362 S.W.3d 559 (Tenn. 2012), contending that the kidnapping was merely incidental to the conduct that constituted the assault of Ms. Thornburg. The State responds that the kidnapping conviction was properly based upon "a separate, independent act" that was not merely incidental to the assault. We agree with the State.

---

[3] Defendant acknowledged that he was on parole at the time of these offenses.

-7-

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In a bench trial, the judge is the trier of fact, and "the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict." *State v. Farrar*, 355 S.W.3d 582, 585 (Tenn. Crim. App. 2011) (quoting *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999)); *see also State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978). The trial court's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to . . . the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict . . . accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Relevant to this case, a person commits especially aggravated kidnapping "who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty," T.C.A. § 39-13-302, and who accomplishes such unlawful removal or confinement "with a deadly weapon." T.C.A. § 39-13-305(a)(1). In *White*, the supreme court interpreted the element of substantial interference with the victim's liberty to mean that the removal or confinement "was to a greater degree than that necessary to commit" an accompanying offense. 362 S.W.3d at 580. In other words, there will not be sufficient evidence to support the offense of kidnapping where the victim's removal or confinement was "essentially incidental to an accompanying felony." *Id.* To determine whether a confinement was greater than necessary to commit an accompanying offense, the trier of fact should consider the following non-exclusive list of factors:

> the nature and duration of the victim's removal or confinement by the defendant;

whether the removal or confinement occurred during the commission of the separate offense;

whether the interference with the victim's liberty was inherent in the nature of the separate offense;

whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

*Id.* at 580-81.

The trial court, as the trier of fact, found that Defendant was guilty of especially aggravated kidnapping by utilizing the *White* factors. The trial court accredited the testimony of the victim over that of Defendant. Given the proof, the trial court found that Defendant's removal or confinement of the victim was "not in the performance of an assault" and that it was beyond reasonable doubt that the removal or confinement was to a greater degree than that necessary to assault the victim. The trial court noted the substantial duration of the truck ride "from Elizabethton to Jonesborough and back" and reasoned that the confinement inside the truck was not necessary for or inherent in the assault. The trial court also found that Defendant prevented the victim from summoning any assistance.

After a careful and thorough review of the record, we conclude that there is sufficient evidence to support the trial court's determination that Defendant unlawfully removed or confined the victim to a greater degree than necessary for him to assault her. Because the victim described Defendant's violent episode as an ongoing beating from Jonesborough to the Talladega Apartments, the issue in this case would be closer had the incident ended there. However, once the couple returned to the Talladega Apartments, the victim overtly attempted to flee the truck, but Defendant grabbed her hair, pulled her back inside, threatened her, and put his pocketknife to her throat. According to the victim, after this point, Defendant stopped hitting her as he drove back into town, but he prevented the victim from leaving the truck and forced her to endure a terrifying and life-threatening police chase. Therefore, "the accompanying felony was completed before the

removal or confinement constituting the kidnapping." *State v. Alston*, ___ S.W.3d ___, No. E2012-00431-SC-R11-CD, 2015 WL 2155690, at * 8 (Tenn. May 5, 2015).

The extensive amount of time that Defendant kept the victim inside the truck was beyond simply enabling further commission of the assault and was instead a separate, independent offense for the purpose of dominating and terrorizing the victim. Defendant refused to let the victim leave the truck despite her repeated requests to be dropped off at numerous locations along the way. The victim was hampered in her ability to summon assistance because she could not exit the moving vehicle and was too frightened to talk into her cellphone when she called 911. Furthermore, confinement in the truck reduced the likelihood that passersby would observe and provide assistance to the battered victim and also reduced the likelihood that the police would ultimately apprehend Defendant. The risk of independent harm to the victim increased drastically as Defendant raced at break-neck speeds through treacherous backwoods roads while intoxicated. Indeed, they nearly had a head-on collision on at least one occasion and also nearly collided with Officer Ensor.

There is ample evidence to support Defendant's conviction for especially aggravated kidnapping as a separate and distinct act from the accompanying assault under the standard set forth in *White*.[4]

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE

---

[4] Although Defendant's appellate brief phrases his issue broadly as a challenge to the sufficiency of the evidence for especially aggravated kidnapping, he has not made an express argument as to any of the elements of this crime other than removal or confinement. We note, however, that there is sufficient evidence to support all elements of especially aggravated kidnapping.